IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ALAN M. OUTMAN,

                    Plaintiff,

     v.

JOANN WALDRON, *et al.*,

                    Defendants.

_____

Civil Action No.
9:14-CV-0540 (TJM/DEP)

APPEARANCES:

FOR PLAINTIFF:

ALAN M. OUTMAN, *Pro Se*
12-B-3915
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

OF COUNSEL:




CHRISTOPHER W. HALL, ESQ.
Assistant Attorney General

<u>REPORT AND RECOMMENDATION</u>

This is an action brought by *pro se* plaintiff Alan Outman, a prison inmate formerly confined in the New York State Office of Mental Health ("OMH") Satellite Unit at the Clinton Correctional Facility ("Clinton"), pursuant to 42 U.S.C. § 1983, against three individuals employed by the OMH, alleging that they deprived him of constitutionally adequate medical care and failed to protect him from self-harm in connection with a suicide attempt in December 2013.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's complaint based on the lack of personal involvement and qualified immunity. For the reasons set forth below, I recommend the motion be denied.

I.    <u>BACKGROUND</u>[1]

Although plaintiff is now confined elsewhere, at the times relevant to this action, he was a prison inmate being held in the OMH Satellite Unit at Clinton, located in Dannemora, New York. *See generally* <u>Dkt. No. 1</u>; <u>Dkt. No. 55-2 at 1</u>. Plaintiff has been "diagnosed with an 'Axis II – Personality Disorder' and Post-traumatic Stress Disorder / Anxiety & Panic Disorder,"

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

as well as gender dysphoria, depression, and anxiety. Dkt. No. 1 at 4; Dkt. No. 55-5 at 29-30, 57, 30-31, 34, 35, 36-37. Plaintiff contends that, prior to the series of incidents giving rise to this action, he had a history of suicide attempts, including on or about September 30, 2013, and November 14, 2013. Dkt. No. 1 at 4; Dkt. No. 55-5 at 54-55, 58.

The events relevant to plaintiff's claims in this action occurred between December 16, 2013 and December 22, 2013. Dkt. No. 1 at 3-6. Specifically, on December 16, 2013, plaintiff wrote a letter to defendant Victoria Chase, a Rehabilitation Counselor 2, who was stationed at the OMH Satellite Unit at Clinton at the time and assigned as plaintiff's therapist. Dkt. No. 1 at 3; Dkt. No. 55-2 at 1; Dkt. No. 55-5 at 62-63, 64. In that letter, plaintiff advised defendant Chase that he was "severely depressed and in need of being seen as soon as possible[.]" Dkt. No. 1 at 3, 8; Dkt. No. 55-5 at 68, 73. According to plaintiff, the next day, defendant Chase responded through a nurse, identified by him as "Sarah Fadden," who told plaintiff that defendant Chase did not have the time to see him due to her caseload but that she would see him at his next scheduled appointment, which was more than three weeks away. Dkt. No. 1 at 3; Dkt. No. 55-5 at 75, 76-77; Dkt. No. 59 at 1.

Plaintiff wrote defendant Chase a second letter, dated December 17,

2013, after receiving her response to the first, intending "to impress upon her the severity of [his] situation and advised her that [he] was facing an impending crisis and needed immediate emergant [sic] intervention." Dkt. No. 1 at 3, 9; *see also* Dkt. No. 55-5 at 78. On December 19, 2013, plaintiff was told by defendant Patrick McCoy, a Nurse 2 employed by the OMH and stationed at the OMH Satellite Unit at Clinton on that day, that defendant Chase "had instructed him to tell [plaintiff] that she would not see or refer [him] due to a [sic] over-burdened case-load[.]" Dkt. No. 59 at 2; *see also* Dkt. No. 1 at 3-4; Dkt. No. 55-5 at 83-84. Plaintiff thereafter informed defendant McCoy that he was experiencing suicidal thoughts and needed to be placed in an observation suicide cell. Dkt. No. 1 at 4; Dkt. No. 55-5 at 79; Dkt. No. 59 at 2. According to plaintiff, defendant McCoy responded by telling plaintiff that he needed to "'stop being so emotional and learn to deal with it.'" Dkt. No. 1 at 4; *see also* Dkt. No. 55-5 at 79; Dkt. No. 59 at 2.

Plaintiff alleges that he wrote a letter to defendant Joann Waldron, the OMH Unit Chief Forensic I at the OMH Satellite Unit at Clinton, on December 19, 2013, explaining that he needed immediate treatment for his depression and suicidal thoughts. Dkt. No. 1 at 4, 10; Dkt. No. 55-5 at 48, 60, 113-15, 116. Plaintiff recounted in his letter that he had previously

informed "two OMH nurses, one being McCoy, of [his] severe depression and suicidal thoughts[.]" Dkt. No. 1 at 10; *see also* Dkt. No. 55-5 at 113-15. Plaintiff did not receive a response from defendant Waldron. Dkt. No. 1 at 4; Dkt. No. 55-5 at 116.

In the evening of December 21, 2013, plaintiff again explained to defendant McCoy that he was depressed and suicidal, and stated that he had been hoarding his medications and planned to commit suicide by overdosing. Dkt. No. 1 at 4; Dkt. No. 59 at 2. Defendant McCoy allegedly responded by telling plaintiff that "the OMH unit was 'full' and that they did not have the time/resources to see [him] on an individual basis." Dkt. No. 1 at 4; *see also* Dkt. No. 55-5 at 83-84; Dkt. No. 59 at 2. When plaintiff replied with a direct threat to commit suicide, defendant McCoy allegedly told plaintiff, "'Well, then do it and stop whining, it'll save us all a lot of time and money, so just go ahead. No one really cares,  your [sic] in prison.'" Dkt. No. 1 at 4; *see also* Dkt. No. 59 at 2.

On December 22, 2013, at approximately 7:00 p.m., plaintiff attempted suicide by swallowing twelve Celexa pills, amounting to 180 milligrams. Dkt. No. 1 at 3, 6; Dkt. No. 55-5 at 47-48, 103; Dkt. No. 59 at 2. Although plaintiff alleges in his complaint that he hoarded three pills per day "for four days" leading up to December 22, 2013, Dkt. No. 1 at 6, in

response to defendants' pending motion, he states that he hoarded two Celexa pills per day between December 16, 2013 and December 22, 2013. Dkt. No. 59 at 2.

Defendants sharply dispute plaintiff's rendition of the events occurring between December 16, 2013 and December 22, 2013. Defendant Chase does not recall ever receiving plaintiff's letters dated December 16 and 17, 2013, and plaintiff's OMH chart does not include a copy of them. Dkt. No. 55-2 at 2. Defendant Chase similarly does not recall making any statements to a nurse regarding plaintiff's letters in or around the time plaintiff contends he sent his letters. *Id.* Defendant Waldron contends that she never received a letter from plaintiff dated December 19, 2013. Dkt. No. 55-4 at 2. For his part, defendant McCoy denies ever being informed by plaintiff between December 16, 2013 and December 22, 2013 that he was hoarding medication. Dkt. No. 55-3 at 2.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about May 8, 2014, with the filing of a complaint and accompanying applications to proceed in the matter *in forma pauperis* ("IFP") and for the appointment of *pro bono* counsel. Dkt. Nos. 1-3. Plaintiff's complaint names, as defendants, (1) Joann Waldron, the OMH Unit Chief at the OMH Satellite Unit at Clinton;

(2) Victoria Chase, an OMH Rehabilitation Counselor 2 at the OMH Satellite Unit at Clinton; and (3) Patrick McCoy, an OMH Nurse 2 at the OMH Satellite Unit at Clinton. Dkt. No. 1 at 1. Plaintiff asserts two causes of action against each of the defendants arising under the Eighth Amendment, including (1) deliberate medical indifference and (2) failure to protect. *Id.* at 7; Dkt. No. 55-5 at 46-47. On June 16, 2014, the court issued a decision and order granting plaintiff's IFP application, denying his motion for *pro bono* counsel, and accepting plaintiff's complaint for filing. Dkt. No. 7.

Following the close of discovery, defendants filed the currently pending motion for summary judgment, contending that no reasonable factfinder could conclude, based on the record now before the court, that any of them were personally involved in the conduct giving rise to the violations alleged, and, in any event, they are entitled to qualified immunity. *See generally* Dkt. No. 55-6. The filing of that motion was followed by plaintiff's submission in opposition, a reply on behalf of defendants, and a surreply by plaintiff. Dkt. Nos. 59, 61, 63. Defendants' motion is now fully briefed and ripe for determination, and has been referred to me or the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   <u>Summary Judgment Standard</u>

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477

U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial

burden is met, the opposing party must show, through affidavits or

otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P.

56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences, in a light most favorable to the

non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of

summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg.*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary

judgment appropriate only when "there can be but one reasonable

conclusion as to the verdict").

B.    Personal Involvement

Defendants' primary ground for seeking dismissal of plaintiff's

complaint is their contention that none of them were personally involved in

the conduct giving rise to plaintiff's Eighth Amendment deliberate medical

indifference and failure-to-protect causes of action. Dkt. No. 55-6 at 6-10.

"Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).[2]

One of the named defendants, Joann Waldron, appears to be named principally based upon her role as a supervisor at the OMH Satellite Unit at Clinton. It is well-established that a supervisor cannot be liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347

---

[2]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish

responsibility on the part of a supervisory official for a civil rights violation,

a plaintiff must demonstrate that the individual (1) directly participated in

the challenged conduct; (2) after learning of the violation through a report

or appeal, failed to remedy the wrong; (3) created or allowed to continue a

policy or custom under which unconstitutional practices occurred; (4) was

grossly negligent in managing the subordinates who caused the unlawful

event; or (5) failed to act on information indicating that unconstitutional

acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007),

*rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009);

*see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

　　　In this case, the record evidence clearly gives rise to a dispute of

material fact as to whether each of the defendants was personally involved

in ignoring plaintiff's warnings that he was suffering from severe

depression and suicidal thoughts between December 16, 2013 and

December 22, 2013. Turning first to defendant Chase, plaintiff's therapist,

while she states in her declaration that she does not remember receiving

the letters plaintiff allegedly sent her on December 16, 2013 and

December 17, 2013, and that plaintiff's OMH record does not include a

copy of those letters, Dkt. No. 55-2 at 2, 3, there is evidence in the record by way of plaintiff's sworn testimony that he, indeed, sent those letters. Dkt. No. 1 at 3-4; Dkt. No. 55-5 at 62-63, 68; Dkt. No. 59 at 1. Adding credence to plaintiff's claim is the fact that he included copies of the letters as attachments to his complaint. Dkt. No. 1 at 8-9. Plaintiff also maintains that defendant Chase responded to his letters through OMH nurses on December 17, 2013 and December 19, 2013. Dkt. No. 1 at 3-4; Dkt. No. 55-5 at 75, 76-77, 83-84; Dkt. No. 59 at 1-2. While defendants contend that the substance of what those nurses told plaintiff constitutes inadmissible hearsay and cannot be relied upon by plaintiff in opposing their summary judgment motion, Dkt. No. 55-6 at 8, plaintiff is not offering the nurses' statements for the truth of the matter asserted. Instead, plaintiff offers the nurses' statements to substantiate his claim that the letters were sent and responded to. Accordingly, the statements are not hearsay. *See* Fed. R. Evid. 801(c), Advisory Committee Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); *accord, United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *see also George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir.1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted,

but merely to show that the defendant was on notice of a danger, is not hearsay."). Because the parties have submitted evidence that is squarely in conflict with respect to whether defendant Chase was personally involved in ignoring plaintiff's complaints about being suicidal just days before his suicide attempt, I recommend defendants' motion be denied as to that defendant.

Turning to defendant Waldron, plaintiff attests that he sent defendant Waldron a letter on December 19, 2013, alerting her to his suicidal ideations and that he was hoarding medicine in advance of a suicide attempt. Dkt. No. 1 at 4; Dkt. No. 55-5 at 48, 60, 113-15; Dkt. No. 59 at 2. He also advised defendant Waldron that he had previously told two OMH nurses that he needed immediate treatment but they failed to respond. Dkt. No. 1 at 4, 10. A copy of plaintiff's letter is included in the record. Dkt. No. 1 at 10. While it is undisputed that defendant Waldron did not respond to this letter, Dkt. No. 55-5 at 116, defendants contend that this is because defendant Waldron "never received" it. Dkt. No. 55-4 at 2.

In her capacity as the Unit Chief at the OMH Satellite Unit at Clinton, and therefore a supervisory official, defendant Waldron may be held responsible for failing to cure a constitutional violation after she learned about it. *See, e.g., Colon*, 58 F.3d at 873. The question in this case is

whether defendant Waldron actually learned about plaintiff not receiving adequate mental health care after informing two OMH nurses, including defendant McCoy, of his suicidal tendencies. Plaintiff insists he sent defendant Waldron a letter informing her of those circumstances and provides, as evidence, a copy of the letter. Dkt. No. 1 at 4, 10. Defendant Waldron, on the other hand, attests that she did not receive plaintiff's letter. Dkt. No. 55-4 at 2. It therefore appears clear that the record contains a dispute of material fact as to whether defendant Waldron learned of the alleged unconstitutional conduct by OMH mental health care providers. Without rendering a credibility determination, I am unable to conclude in favor of either party at this juncture. For this reason, I recommend defendants' motion be denied as it relates to defendant Waldron.

Addressing next plaintiff's claims against defendant McCoy, there is a stark contrast in the record between plaintiff's version of his communications with that defendant and defendant McCoy's version. Plaintiff maintains that the first time he informed defendant McCoy  he was "having thoughts of self-harm and suicide," McCoy responded only by telling plaintiff to "'stop being so emotional.'" Dkt. No. 1 at 4; *see also* Dkt. No. 59 at 2. On December 21, 2013, plaintiff allegedly told defendant

McCoy again that he was feeling suicidal and that he was "hoarding [his] medication to try and overdose." Dkt. No. 1 at 4; *see also* Dkt. No. 59 at 2. According to plaintiff, defendant McCoy did not take any steps to address plaintiff's symptoms or otherwise verify whether plaintiff was hoarding medicine. *Id.* Instead, defendant McCoy allegedly responded by telling plaintiff that, because he is a prisoner, no one cares if he commits suicide. *Id.* In his declaration in support of defendants' motion, however, defendant McCoy unequivocally "den[ies] that [plaintiff] ever told [him] between December 16, 2013 and December 22, 2013 that [plaintiff] was hoarding the medication [he] was giving [plaintiff], hoarding any other medication or that [plaintiff] had suicidal thoughts except on the night of December 22, 2013." Dkt. No. 55-3 at 2. In light of the parties' disputes as to whether defendant McCoy ignored plaintiff's suicidal tendencies in the days leading up to his suicide attempt, I recommend defendants' motion be dismissed with respect to this defendant.

C.    Qualified Immunity

As an alternative basis for dismissing plaintiff's complaint, defendants contend that they are entitled to qualified immunity from suit. Dkt. No. 55-6 at 10-11.

"Qualified immunity shields government officials from civil damages

15

liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from

suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of

the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants in this matter are not entitled to qualified immunity from suit at this stage of the litigation in light of the disputes of material fact that exist in the record with respect to whether they ignored plaintiff's complaints and warnings of his suicidal tendencies leading up to his suicide attempt on December 22, 2013. If a reasonable factfinder credits plaintiff's testimony and believes that he informed defendants Chase, Waldron, and McCoy, in advance of his suicide attempt, that he was experiencing suicidal tendencies and yet they took no steps to intervene, defendants' conduct could be determined to have been in violation of plaintiff's clearly established constitutional right to be free from deliberate indifference to a serious medical need and/or to a serious risk of harm. *See, e.g., Kelsey v. City of N.Y.*, No. 03-CV-5978, 2006 WL 3725543, at *4 (E.D.N.Y. Dec. 18, 2006) ("In the detainee suicide context, deliberate indifference may exist . . . [when] the detaining authorities . . . discovered and have been aware of the [plaintiff's] suicidal tendencies, but [were] deliberately indifferent in the manner by which they respond to the recognized risk of suicide[.]" (citing *Rellergert v. Cape Girardeau Cnty.,*

*Mo.*, 924 F.2d 794, 796 (8th Cir.1991)). Accordingly, I recommend that defendants' motion be denied to the extent it seeks dismissal of plaintiff's complaint on the basis of qualified immunity.

IV.     SUMMARY AND RECOMMENDATION

Defendants' motion seeks dismissal of plaintiff's complaint on two narrow grounds: personal involvement and qualified immunity. Neither of defendants' arguments is addressed to the underlying merits of plaintiff's Eighth Amendment deliberate indifference and failure-to-protect causes of action. Based on review of the record evidence, it appears clear that there are disputes of material fact with respect to whether any of the named defendants were personally involved by becoming aware of plaintiff's suicidal thoughts prior to his suicide attempt but failing to take any steps to provide him treatment. For this reason, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 55) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     February 29, 2016
           Syracuse, New York

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an in-
mate then in confinement at the Federal Correction-
al Institution in Otisville, New York ("Otisville"),
filed this action for injunctive relief and damages
based upon alleged violations of his rights under
the United States Constitution, Amendments I, IV,
V, VI, IX, and XIII, and upon violations of various
laws and/or regulations governing prison adminis-
tration.[FN1] The Complaint named as defendants
G.L. Hershberger ("Hershberger"), the United
States Attorney General ("Attorney General"), Gary
Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith
("Keith"), the Bureau of Prisons ("BOP"), and the
Otisville Medical Department ("OTV Medical De-
partment") (collectively "Defendants"). Defendants
moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure,
or, in the alternative, for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Proced-
ure. For the reasons set out below, Defendants' Rule
12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Com-
plaint, pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, for failure to state a claim upon

which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such
time as not to delay the trial, any party may move
for judgment on the pleadings. If, on a motion for
judgment on the pleadings, matters outside the
pleadings are presented to and not excluded by
the court, the motion shall be treated as one for
summary judgment and disposed of as provided
in Rule 56, and all parties shall be given reason-
able opportunity to present all material made per-
tinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that
are employed for dismissing a complaint for failure
to state a claim under Fed.R.Civ.P. 12(b)(6) are ap-
plicable" to a Rule 12(c) motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. *See Ad–Hoc Comm. of the Baruch Black &
Hispanic Alumni Ass'n v. Bernard M. Baruch Col-
lege,* 835 F.2d 980, 982 (2d Cir.1987); *see also Vi-
acom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Ar-
thur R. Miller, *Federal Practice and Procedure* ¶
1367, at 515–16 (1990). Thus, the Court must read
the Complaint generously, drawing all reasonable
inferences from the complainant's allegations. *See
California Motor Transp. v. Trucking Unlimited,*
404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations
in [the] amended complaint, which are accepted as
true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to docu-
ments either in plaintiff['s] possession or of which
plaintiff[ ] had knowledge and relied on in bringing
suit." *Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir.1993); *accord Allen v. West-
point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112
S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,*
930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

   **\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2006 WL 3725543
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Valerie KELSEY, Theodore Goddard,
Individually, and as Co-Administrators of
the Estate of Curtis Goddard, Plaintiffs,

v.

The CITY OF NEW YORK, P.O. Thomas
Marrone, Shield # 07784, Sergeant George
Kallas, Shield # 01144, Lt. James Marron, P.O.
Michael Sykora, Shield # 18496, P.O. Cory Fink,
Shield # 14713, P.O. Martin Halligan, Shield
# 18367, P.O. Paul Bernal, Shield # 10349,
P.O. Matthew Lindner, Shield # 19417, P.O.
Shawline Senior, Shield # 02385, Defendants.

No. 03-CV-5978(JFB)(KAM).
|
Dec. 18, 2006.

**Attorneys and Law Firms**

Kenechukwu Chudi Okoli, Esq., New York, NY, for
plaintiffs.

Jennifer Amy Rossan, Esq., Assistant Corporation Counsel
of the City of New York for Michael A. Cardozo, Esq.,
Corporation Counsel of the City of New York, New York,
NY, for defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** Plaintiffs Valerie Kelsey and Theodore Goddard bring
this action on behalf of themselves and the estate of Curtis
Goddard, alleging, *inter alia,* claims for violation of civil
rights under 42 U.S.C. § 1983 and a pendent wrongful
death/negligence claim under state law. Defendants move
for summary judgment on all claims. For the reasons stated
below, summary judgment is granted as to plaintiffs' claim
alleging violation of § 1983. Further, with the dismissal of
the federal claim from the instant lawsuit, the Court exercises
its discretion to decline jurisdiction over the remaining state
claim arising in negligence, and, thus, dismisses that claim
without prejudice.

**I. BACKGROUND**

The following facts are undisputed unless otherwise
indicated. On August 15, 2002, Curtis Goddard ("Goddard")
arrived at and entered an apartment on Beach Channel Drive
("the apartment"), a residence at which Maria Buffamante
("Buffamante") lived with her children. (*See* Defs.' Rule
56.1 Statement of Material Facts ("Defs.' 56.1 Stmt."), ¶¶
7, 11.) Goddard lived occasionally at the apartment as well,
as Buffamante's boyfriend. (*See* Pls.' Rule 56.1 Statement of
Material Facts ("Pls.' 56.1 Stmt."), ¶ 7; *see also* Defs.' 56.1
Stmt., ¶ 9.) On the previous day, August 14, 2002, Buffamante
had informed Goddard that their relationship was over. (*See*
Pls.' 56.1 Stmt., ¶ 10(a); *see also* Defs.' 56.1 Stmt., ¶ 10.)
At the time Goddard entered the apartment, it was occupied
by Buffamante, her children, and her friends Tyisha Safford,
Leonar Jesus Espinal and an individual known as "Blue." (*See*
Defs.' 56.1 Stmt., ¶ 8.) After Goddard entered the apartment,
Buffamante, Espinal and "Blue" asked Goddard to leave the
premises. (*See id.,* ¶ 12.) Goddard refused, and brandished
a firearm.[1] (*See* Defs.' 56.1 Stmt., ¶ 13; *see also* Pls.' 56.1
Stmt., ¶ 13(b).)

New York City Police Department Sergeant George Kallas
and Police Officers Thomas Marrone, Michael Sykora, Cory
Fink, Martin Halligan, and Paul Bernal responded to a call
regarding a dispute with a firearm at the apartment. (*See* Defs.'
56.1 Stmt., ¶ 5.) As the officers arrived at the apartment,
"Blue" informed them that there was an individual with a
gun inside the apartment. (*See* Defs.' 56.1 Stmt., ¶ 14; *see
also* Pls.' 56.1 Stmt., ¶ 14.) Although it is disputed whether
or not the police officers knocked on the apartment door, it
is undisputed that the door was opened by Espinal, and the
occupants of the apartment, save Goddard, ran out. (*See* Defs.'
56.1 Stmt., ¶ 15; *see also* Pls.' 56.1 Stmt., ¶ 15.) The officers
entered the apartment, and observed Goddard run towards the
kitchen.[2] (*See* Defs.' 56.1 Stmt., ¶ 16.)

The officers attempted to arrest Goddard in the kitchen,
who resisted and refused to be handcuffed. (*See id.,* ¶ 17.)
The officers were eventually successful in restraining and
handcuffing Goddard. (*See id.,* ¶ 22.) The officers searched
Goddard and seized a sock filled with ammunition, a ski
mask, his gun, and a razor blade.[3] (*See* Defs.' 56.1 Stmt., ¶¶
22-23, 28; *see also* Pls.' 56.1 Stmt., ¶¶ 22-23, 28.)

**\*2** Goddard was escorted out of the apartment with his hands cuffed behind his back. (*See* Defs.' 56.1 Stmt., ¶ 24.) As he was being escorted out of the apartment, Goddard attempted to grab Officer Barnal's gun, while exclaiming "shoot me, kill me." (*See id.,* ¶ 25.) Officer Marrone held Goddard until he was able to confirm that Officer Bernal had control of his gun. (*See id.,* ¶ 26.) Goddard was brought out into the hallway, and was positioned facing the wall, approximately four to five feet from a stairwell door. (*See* Defs.' 56.1 Stmt., ¶ 27; *see also* Pls.' 56.1 Stmt., ¶ 27(a)). While placed facing the wall, Goddard was surrounded by Officers Sykora, Fink, Hallagan and Bernal in a semi-circle. (*See* Defs.' 56.1 Stmt., ¶ 29.) Sergeant Kallas instructed the officers to physically hold onto Goddard. (*See id.,* ¶ 30.) Pursuant to that order, Officer Sykora held onto Goddard while he was stood against the wall. (*See id.,* ¶ 32.)

Sergeant Kallas requested that the Emergency Services Unit and an ambulance respond to the scene to assist with an emotionally disturbed person (EDP). (*See* Defs.' 56.1 Stmt., ¶ 31; *see also* Pls.' 56.1 Stmt., ¶ 31.) Kallas and Lieutenant Marron then went down the hall to interview the occupants of the apartment. (*See* Defs.' 56.1 Stmt., ¶ 39.) After approximately five minutes, Goddard was turned around, so that he faced the surrounding officers. (*See* Defs.' 56.1 Stmt., ¶ 33.) Officer Sykora spoke to Goddard to ascertain what had happened prior to the arrival of the police at the apartment. (*See id.*) The parties agree that Goddard was relatively calm, although plaintiffs point to evidence in the record indicating that he was sweating and fidgety. (*See* Defs.' 56.1 Stmt., ¶ 34; *see also* Pls.' 56.1 Stmt., ¶ 34.) Officer Sykora released his physical hold on Goddard. (*See* Defs .' 56.1 Stmt., ¶ 35.) Goddard then made a sudden move at Sykora, and Officer Fink pushed Sykora out of the way, in order to prevent contact. (*See* Defs.' 56.1 Stmt., ¶¶ 36-37; *see also* Pls .' 56.1 Stmt., ¶¶ 36-37.) Goddard proceeded to escape from the officers, and ran towards the stairwell door. (*See* Defs.' 56.1 Stmt., ¶ 37.) According to defendants, Officer Shawline Senior was standing next to the stairwell door, and attempted to grab Goddard as he ran through the stairwell door, but failed. [4] (*See* Defs.' 56.1 Stmt., ¶ 38.)

Sykora, Fink, Bernal, Halligan, Marrone, Lindner and Marron immediately chased after Goddard as he ran up the stairway to the rooftop of the building, while rear-cuffed. (*See* Defs.' 56.1 Stmt., ¶ 42.) Officer Sykora observed Goddard lean over a fence on the roof, and then twist his body so that he fell off the rooftop. (*See id.,* ¶ 44.) Goddard died as a result of injuries he assumed from the fall. (*See* Okoli Decl., Ex. O.)

The New York Police Department investigated the incident, and disciplined Officer Sykora for failing and neglecting to safeguard a prisoner, resulting in the loss of the prisoner. (*See* Pls.' 56.1 Stmt., ¶ 54.) The report noted that Sykora was responsible for securing Goddard, and that the circumstances warranted him physically holding on to Goddard. (*See* Okoli Decl., Ex. M.) Further, the report noted that it was Sykora's duty to maintain physical control of Goddard, since he was the one holding Goddard when Kallas gave him the order to not let go of him. (*See id.*) The same report investigated the actions of Fink, Kallas, Marrone, Halligan, Bernal, Linder, Senior and Marron, but found that discipline was not warranted as to those officers. (*See id.*)

**\*3** Valerie Kelsey and Theodore Goddard, the co-administrators of Curtis Goddard's estate, filed the instant action, against the City of New York and the individual officers mentioned above, alleging causes of action under 42 U.S.C. §§ 1983 and 1985, based upon the following: (1) deliberate indifference to Goddard's safety needs; (2) the failure by the City to train and supervise the defendants; (3) the use of excessive force when handcuffing Goddard; and (4) a conspiracy by the defendants to not recapture Goddard after his escape from custody and/or a conspiracy to let Goddard fall from the rooftop. In addition, the complaint alleged a pendent claim for negligence arising under state law.

Defendants moved for summary judgment on all claims. In plaintiffs' opposition papers, they explicitly abandoned all claims except "1) damages for wrongful death based upon defendants' deliberate indifference to his safety needs, pursuant to 42 U.S.C. § 1983, and 2) damages for the wrongful death of the decedent due to the negligence of the individual defendants." (Pls.' Opp. Br., at 2.)

The case was re-assigned to the undersigned from the Honorable Carol B. Amon on February 10, 2006. The Court held oral argument on the instant motion as to the two remaining claims on August 11, 2006.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (citation omitted); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial."* *Caradola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)).

### III. DISCUSSION

**\*4** As a threshold matter, the Court notes that defendants moved for summary judgment on all claims contained within the Amended Complaint. In their opposition papers, plaintiffs explicitly abandoned all of their claims, save two: (1) plaintiffs' claim under 42 U.S.C. § 1983 against the individual officers, alleging deliberate indifference to Goddard's safety needs under the Fourteenth Amendment; and (2) plaintiffs' state law negligence claim for the alleged wrongful death of Goddard, as against both the City of New York and the individual officer defendants. (*See* Memorandum of Law of Plaintiffs in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp. Mem.") at 1-2.) The Court proceeds to address defendants' motion with respect to each of the remaining claims in turn.

### A. Failure to Protect Under 42 U.S.C. § 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137,

145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Section 1983provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. For claims under § 1983, a plaintiff must prove "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted).

Plaintiffs' remaining § 1983 claim alleges a violation of Goddard's substantive due process rights under the Fourteenth Amendment. Specifically, plaintiffs allege that the defendant officers failed to protect Goddard from himself, while he was in custody. When in the custody of police, an arrestee has the right to care and protection, including protection from suicide.[5] *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1115 (11th Cir.2005) ("[P]retrial detainees like [plaintiff] plainly have a Fourteenth Amendment due process right 'to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.' ") (quoting *Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir.1994) (citations omitted)); *see also Hare v. Corinth, Miss.,* 74 F.3d 633, 647 & 648 n. 3 (5th Cir.1996) (collecting cases involving claims for failure to protect individuals in custody from suicide). In the detainee suicide context, the relevant inquiry is whether defendants were deliberately indifferent to the medical need of the detainee to be protected from himself. *See Weyant,* 101 F.3d at 856.

**\*5** Defendants argue that summary judgment should be granted in their favor on plaintiffs' § 1983 claim because no jury could reasonably find that defendants acted with deliberate indifference to the safety needs of the decedent.[6]

" 'Deliberate indifference' describes a mental state more blameworthy than negligence; but a plaintiff is not required to show that the defendant acted for the 'very purpose of causing harm or with knowledge that harm will result.' " *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) ( "[N]egligence is not deliberate indifference.") "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.' " *Hernandez,* 341 F.3d at 144 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). "[D]eliberate indifference involves unnecessary and wanton infliction of pain, or other conduct that shocks the conscience." *Hathaway,* 99 F.3d at 553 (2d Cir.1996). In order for the plaintiffs to satisfy their burden to show deliberate indifference, they must demonstrate that each charged official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (quoting *Farmer,* 511 U.S. at 837); *accord Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002).

In the detainee suicide context, deliberate indifference may exist pursuant to one of two broad fact scenarios. *See Rellergert v. Cape Girardeau County, Mo.,* 924 F.2d 794, 796 (8th Cir.1991). First, state officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies. *See id.* (collecting cases). Alternatively, the detaining authorities could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide, an inquiry which focuses on the adequacy of preventative measures. *See id.* In the instant case, defendants argue that they were not deliberately indifferent in either respect, specifically they argue: (1) that the decedent's acts were more "homicidal" than "suicidal," and so that plaintiffs cannot establish that defendants were deliberately indifferent to decedent's suicidal tendencies; and (2) that the actions of the officers in dealing with the threat of suicide were reasonable and did not exhibit "deliberate or willful lack of concern" to the safety needs of decedent.

As a threshold matter, the Court rejects defendants' argument that the record does not support a finding that the officers were aware of Goddard's suicidal tendencies. The defendants do not dispute that Goddard exclaimed "shoot me, kill me" to the defendant officers when he was trying to grab

Officer Bernal's gun. (*See* Defs.' 56.1 Stmt., ¶ 25.) Viewing that statement in a light most favorable to the plaintiffs, a reasonable jury could conclude that decedent was exhibiting a readily ascertainable desire to have his life ended through "suicide by cop." In fact, the actions of Sergeant Kallas support the conclusion that the defendant officers were aware of Goddard's suicidal tendencies because he requested emergency services to respond to assist with an emotionally disturbed person. Thus, the proper inquiry in the instant motion for summary judgment is whether a rational jury could find that insufficient preventative measures were taken by the defendant officers, such that they were deliberately indifferent to the risk of suicide.

**\*6** Where officers take affirmative and deliberate steps to protect inmates from suicide, other circuits have generally found deliberate indifference lacking, even in the face of potentially negligent actions by the officers and/or a failure to comply with standard policies or procedures. For example, in *Rellergert,* 924 F.2d at 797, the Eighth Circuit assumed, drawing all inferences in favor of a plaintiff's jury verdict, that an officer let an inmate out of his sight with a bedsheet, notwithstanding the fact that the inmate was on suicide watch. The Eighth Circuit noted that the evidence supported the statement that the officer had conflicting responsibilities to which he had to attend, which prevented him from leaving his observation booth and monitoring the inmate. *See id.* Under these facts, the Eighth Circuit affirmed the district court's judgment notwithstanding the verdict, noting that while "the jury might reasonably conclude that [the defendant officer] acted imprudently, wrongly, or negligently," the evidence could not support a finding of deliberate indifference as a matter of law. *See id.* at 797-98.

Similarly, in *Brown v. Harris,* 240 F.3d 383, 390 (4th Cir.2001), the Fourth Circuit asserted the proposition that even where an officer is aware of the substantial risk of serious harm, he or she may avoid liability "if he responded reasonably to the risk of which he knew." The Fourth Circuit noted that the defendant officer had responded to the decedent's medical needs-volatility from drug withdrawal and a suicide risk of some kind-by placing him under "medical watch," which involved constant video surveillance. *See id.* Although it was noted that the officer failed to place the inmate in a paper gown, as was the ordinary custom with suicidal detainees, the court stated that the officer's failure to take certain precautions do not create a jury issue as to deliberate indifference "if his actions were nonetheless reasonable in response to the risk of which he actually knew."

*Id.* The officer "simply took less action than he could have, and by his own admission, should have ... at most [the defendant officer's] failure to take additional precautions was negligent, and not deliberately indifferent, because by placing [the decedent] on constant video surveillance, he simply did not 'disregard [ ] an excessive risk to [decedent's] health or safety.' " *Id.* at 390-91 (quoting *Farmer,* 511 U.S. at 837). Accordingly, the Fourth Circuit concluded that there was no basis for a reasonable finder of fact to conclude that the defendant officer acted with deliberate indifference. *See id.* at 391.

Moreover, in *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998), the Eighth Circuit held that prison officials did not demonstrate deliberate indifference and were entitled to qualified immunity where a detainee classified as a suicide risk was able to hang himself on a metal-framed electrical conduit in a temporary holding cell. In affirming the district court's decision to grant summary judgment for the defendants, the Eighth Circuit recognized the high burden imposed by the deliberate indifference standard and emphasized that the court must closely examine the actions taken by the officials to prevent suicide, even if other steps were omitted:

> ***7** Appellant contends that the district court erred in focusing on the efforts which [the prison official] undertook. Instead, Appellant points to all of the actions which [the official] should have taken. Unfortunately, [the official] did not have the benefit of twenty-twenty hindsight, as we do now. Thus, we must examine those precautionary actions which were undertaken. Appellant seems to ignore the fact that [the official] did classify [the detainee] as a suicide risk, and he did take the preventive measures of placing him in the temporary holding cell and removing his shoes and belt. Additionally, [the official] periodically checked on [the detainee]. While [the official] may have been negligent in not checking on [the detainee] more often, or in failing to notice the exposed electrical conduit in the temporary holding cell, we cannot say as a matter of law that his actions were indifferent. To the contrary,

> [the official's] actions constituted affirmative, deliberate steps to prevent [the detainee's] suicide. Despite [the official's] ultimate failure to prevent that suicide, [the official] did not act with deliberate indifference.

*Id.* at 578.

Finally, in *Rhyne v. Henderson County,* 973 F.2d 386, 393-94 (5th Cir.1992), the Fifth Circuit held that, as a matter of law, a jury could not find deliberate indifference where officials checked suicidal inmates only every ten minutes. The Fifth Circuit noted that, although under the facts of the case, periodic checks may have been in fact inadequate and could form the basis of a sound negligence claim, the periodic checks reflected concern, rather than apathy for inmate safety, and no evidence indicated that frequent periodic checks were obviously inadequate. *See id.*

Viewing the facts of this case in a light most favorable to the plaintiffs, even though the steps taken by the police in hindsight were insufficient to prevent Goddard from committing suicide, there is no reasonable basis for a jury to find that the defendant officers exhibited deliberate indifference to Goddard's safety needs. It is *undisputed* that the defendants took a number of affirmative steps towards protecting Goddard, including the following: (1) they seized dangerous items that he possessed, including a firearm and a razor blade; (2) they handcuffed him behind his back; (3) they called for the assistance of the Emergency Services Unit ("ESU"); (4) they cornered him against a wall in the hallway, surrounded by four police officers while they waited for ESU; and (5) after Goddard escaped, seven officers immediately chased him as he ran up the stairway to the roof. (*See* Defs.' 56.1 Stmt., ¶¶ 22-23, 27-29, 42; *see also* Pls.' 56.1 Stmt., ¶¶ 22-23, 27-29, 42.) These actions exhibited concern, rather than apathy, for Goddard's safety needs.

The real focus of plaintiffs' deliberate indifference claim is the failure of Officer Sykora to physically hold Goddard, rather than merely surrounding him with officers. Although in hindsight it may have been more prudent for Sykora to maintain a physical hold on Goddard, despite the fact that he appeared to be calming down, a reasonable finder of fact could not conclude that the steps taken were obviously inadequate to the risk that Goddard would be able to extricate himself from custody and take his own life by running up the stairwell and jumping off the roof of the building. [7]

*See Taylor v. Wausau Underwriters Ins. Co.,* 423 F.Supp.2d 882, 896-97 (E.D.Wis.2006) (finding lack of deliberate indifference as a matter of law where it was not foreseeable that the actions of the state official-allowing cell to be dark for a few minutes-would allow for decedent's suicide). In light of the significant steps taken to protect Goddard, including the belief that surrounding him against a wall would be sufficient to prevent him from escaping, the mere fact that these measures failed does not provide a basis from which a reasonable jury could conclude that the defendants were deliberately indifferent. *See Rellergert,* 924 F.2d at 797 ("It is deceivingly inviting to take the suicide, *ipso facto,* as conclusive proof of deliberate indifference. However, where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk.").

 **\*8** Although plaintiffs place emphasis on the fact that Officer Sykora's decision to release his physical hold on Goddard was contrary to Sergeant Kallas' instruction, the failure to follow that instruction, by itself, does not provide a sufficient basis for a jury to find deliberate indifference. For example, in *Belcher v. Oliver,* 898 F.2d 32, 35-36 (4th Cir.1990),* the officers' failure to follow the instruction of the police chief to remove shoelaces and belts from prisoners resulted of a prisoner's suicide. In reversing the district court's denial of summary judgment, the Fourth Circuit noted that "a failure to carry out established procedures, without more, does not constitute 'deliberate disregard for the possibility' that [the prisoner] 'would take his own life.' " *Id.* at 36 (quoting *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.1983)). One would not generally view a handcuffed prisoner, whose weapons had been removed and was surrounded by police in a hallway, to be at risk for suicide. Given all the other steps taken by the officers to prevent Goddard from harming himself, the failure to follow Sergeant Kallas' instruction to hold Goddard cannot support a finding of "deliberate indifference" by a jury. [8]

In sum, had the officers acted differently, the tragedy of Goddard's death might have been prevented. The Court is cognizant of the great caution that district courts must exercise in granting summary judgment, especially where state of mind is the core issue. *See Bryant v. Maffuci,* 923 F.2d 979, 985 (2d Cir.1991); *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985). However, the record does not include evidence from which a reasonable jury could find that the defendant officers were deliberately indifferent such that the plaintiffs' constitutional claim may proceed.

Far from being deliberately indifferent, the officers took several steps, though insufficient in hindsight, to ensure Goddard would not hurt himself or others once in custody. A reasonable jury could not find deliberate indifference where the officers removed dangerous items from Goddard, handcuffed him, called for ESU, and surrounded him with at least four officers while waiting for ESU. As the Fourth Circuit noted in *Belcher,* "[w]e do not for one moment dismiss the pain of these events for those involved" and "hold only that their tragic character cannot be ameliorated by efforts to affix constitutional blame where it does not belong." *Belcher,* 898 F.2d at 36. That is precisely the situation here. Accordingly, summary judgment is granted with respect to plaintiffs' remaining claim arising under § 1983. [9]

### B. Qualified Immunity

Defendants also argue that, even if the Court found a constitutional duty to prevent someone from escaping custody and that their conduct violated Goddard's constitutional right to be free from harm to himself even after escaping custody, their conduct should still be entitled to qualified immunity. The Court agrees.

 **\*9** It is well settled that a police officer may be shielded from liability for civil damages if "his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003). "The availability of the defense [of qualified immunity] depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d at 858 (internal quotation marks, citation and alterations omitted).

Thus, when a qualified immunity defense is raised, a court must conduct a two-fold inquiry. First, the court must ascertain whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, even if a constitutional right has been violated, the court should still find qualified immunity exists " 'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that this action did not violate such law.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Johnson*

*v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

The Court has already concluded that, taking the proof in the light most favorable to plaintiffs, they have failed to demonstrate a violation of a constitutional right in this case under the deliberate indifference standard. Although the inquiry could end there, the Court will proceed to analyze the defendants' conduct under the second part of the qualified immunity test because it demonstrates that, even if Goddard's constitutional right was violated, the officers are entitled to qualified immunity.

Under the second part of the qualified immunity test, "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson,* 317 F.3d at 197 (alterations in original) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)); *accord LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). Moreover, the right must be clearly established "in light of the specific context of the case." *Saucier,* 533 U.S. at 201.

As noted earlier, the Second Circuit has found that pretrial detainees have the right to medical treatment for serious medical needs under the Fourteenth Amendment, *see, supra,* note 5, which would clearly include treatment to prevent suicide. Thus, a pretrial detainee's right to be free from deliberate indifference by police officers to suicide, *while in custody,* is a clearly established right. Here, however, Goddard committed suicide after he escaped from police custody. [10] As discussed *supra,* the Court is unaware of any Supreme Court or Second Circuit cases which have found that a detainee has the right to medical attention, including prevention of suicide, *after* he has escaped from custody. *See, supra,* note 6; *see also Purvis v. City of Orlando,* 273 F.Supp.2d 1321, 1327 (M.D.Fla.2003) ("[Police officer] cannot be held accountable for [arrestee's] actions subsequent to his escape" where "[officer] had no way of knowing [arrestee] would jump the fences he jumped, or enter the retention pond where he drowned."). Although such a right may exist, the Court does not find any basis to conclude that such a right was "clearly established" at the time the incident took place in the instant case.

**\*10** Even assuming *arguendo* that such a right was clearly established, the officers here would still be shielded by qualified immunity because it was objectively reasonable for them to believe that their conduct was not deliberately indifferent to Goddard's needs. *See McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) ("[T]o establish their qualified immunity defense, the defendants must show that it was 'objectively reasonable' for them to believe that they had not acted with the requisite deliberate indifference.") (citation omitted). As noted earlier, the key decision being challenged here is Officer Sykora's decision not to maintain a hold on Goddard while they waited for ESU to arrive. Against the backdrop of the deliberate indifference standard, that decision cannot be viewed as objectively unreasonable in light of the other evidence in the case. *See Rellergert,* 924 F.2d at 797 ("While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.") In particular, the officers took substantial steps to ensure Goddard's safety-they seized dangerous items from him, handcuffed him, called ESU, cornered him against a wall in the hallway, and surrounded him with officers. It is also undisputed that Officer Sykora was initially physically holding Goddard when he was standing facing the wall and, after approximately five minutes, turned Goddard outward to begin speaking with him in order to find out what had happened prior to the arrival of the police. (*See* Defs.' 56.1 Stmt., ¶¶ 32-33; *see also* Pls.' 56.1 Stmt., ¶¶ 32-33.) Although plaintiffs point to evidence that Goddard was sweating and fidgety, they also admit he was otherwise calm. (*See* Pls.' 56.1 Stmt., ¶ 34.)

Under such circumstances, the decision to release the physical grasp on Goddard in the hallway (especially when he had calmed down), while he was still handcuffed and surrounded by officers, should not deprive the officers of qualified immunity. In fact, one might conclude that, if the officers had continued to physically hold Goddard even after he calmed down, that could have agitated and unnecessarily provoked him, and exacerbated the situation, rather than de-escalating the situation by releasing the hold. This type of split-second judgment call in an extremely difficult situation is exactly the type of discretionary decision, within the bounds of objectively reasonable conduct under the deliberate indifference standard, that should be protected under the doctrine of qualified immunity. In particular, the Court notes that, unlike decisions by prison officials usually made under the controlled circumstances of a detention facility, *see supra,* the decisions here had to be made quickly in the context of a temporary detention in the hallway of a residential

building. *See Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 309 (4th Cir.2004) (finding that the defendant officers were not deliberately indifferent to the medical needs of an arrestee who died while in transport to a detention center where "the record ... contains no evidence suggesting that these officers recognized that their actions were inappropriate *under the circumstances"* ) (emphasis added). These officers' inability to spend a substantial period of time deliberating about the best course of action in this uncontrolled hallway environment must be taken into consideration and, under the circumstances of the instant case, it is clear that the officers did not possess a sufficiently culpable state of mind to deprive them of qualified immunity. Accordingly, even if plaintiffs could establish that Goddard's constitutional rights were violated, the defendants would be entitled to dismissal of the claims under the doctrine of qualified immunity.

## C. Supplemental Jurisdiction

 **\*11** Having granted summary judgment dismissing plaintiffs' federal claim under § 1983, the only remaining claim is plaintiffs' negligence claim arising under state law. Under 28 U.S.C. § 1367(c)(3), the Court must consider whether it should continue to exercise jurisdiction over the remaining state claim. In determining whether to continue to retain jurisdiction, district courts consider factors such as judicial economy, convenience, fairness and comity. *See Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1191 (2d Cir.1996). Although a court possesses the discretion to retain jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003) (citing *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988); *Baylis v. Marriott Corp.,* 843 F.2d 658, 665 (2d Cir.1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims.") (quoting *Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966)).

In the instant case, the Court exercises its discretion to decline jurisdiction over the remaining state claim. Although discovery has been completed and the instant case has proceeded to the summary judgment stage, it is not clear to the Court why the discovery would need to be repeated if the

negligence claim is litigated in state court. *See Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 255 (S.D.N.Y.2005) (exercising discretion to decline jurisdiction over state claims after summary judgment was granted as to all federal claims, noting that there was no indication that discovery would need to be repeated). Moreover, addressing the plaintiffs' negligence claim would require this court to perform at least some non-obvious interpretations of New York State law, including, *inter alia,* whether plaintiffs' recovery is barred by what defendants allege was the commission of a class A misdemeanor, escape in the third degree, under *Johnson v. State,* 253 A.D.2d 274 (N.Y.App.Div.1999), or whether decedent's emotional state removes this action from the ambit of *Johnson.* Resolution of this and similar issues is best left to state courts. [11] *Valencia,* 316 F.3d at 305 (" '[N]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.' ") (quoting *Gibbs,* 383 U.S. at 726); *see also Rounseville v. Zahl,* 13 F.3d 625, 631-32 (2d Cir.1994) (finding that although the state law at issue was well-settled, the application of the law to the facts of the case at hand was potentially novel and was therefore more appropriately resolved in state court); *Adee Motor Cars,* 388 F.Supp.2d at 256 (refraining from exercising jurisdiction over remaining state claim and noting that resolution of the claim would "involve at least some nonobvious interpretations of New York state law ... the resolution of these issues would be best left to state courts"). Finally, "since New York's CPLR § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations, plaintiff[s] will not be unduly prejudiced by the dismissal of [their] state law claims." *Trinidad v. New York City Dept. of Correction,* 423 F.Supp.2d 151, 169 (S.D.N.Y.2006) (citing *Mayer v. Oil Field Systems Corp.,* 620 F.Supp. 76, 77-78 (S.D.N.Y.1985)). Accordingly, plaintiffs' state law claim is dismissed without prejudice.

## IV. CONCLUSION

 **\*12** For the foregoing reasons, summary judgment is GRANTED as to plaintiffs' federal claims arising under 42 U.S.C. § 1983. Further, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining claim arising under state law, and dismisses such claim, without prejudice. The Clerk of the Court shall close this case.

SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2006 WL 3725543

Footnotes

1  According to the deposition testimony of Buffamante, Goddard pulled his gun after he observed "Blue" reach into his pocket in a manner appearing to indicate that he was reaching for a knife. (*See* Declaration of K.C. Okoli ("Okoli Decl."), Ex. J at 71-73.) After he pulled the firearm, Goddard forced "Blue" to go out into the hallway outside the apartment, and then locked the door. (*See id.* at 73.)

2  Plaintiffs dispute whether or not Sergeant Kallas followed the other officers into the apartment, but do not cite anything from the record to substantiate this claim, as required in a statement submitted pursuant to Rule 56.1. Local Civil Rule 56.1(d) ("Each statement made by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."). Notwithstanding that defect, the Court notes that the factual dispute regarding whether Sergeant Kallas followed the other officers into the apartment has no bearing on the adjudication of the instant motion for summary judgment.

3  Plaintiffs dispute the location from which these items were recovered. (*See* Pls.' 56.1 Stmt., ¶¶ 22-23, 28.) However, plaintiffs do not dispute the fact that these items were in fact seized by the officers from Goddard, which is all that is necessary to address the instant motion for summary judgment.

4  Plaintiffs assert that no officer attempted to grab Goddard when he escaped, citing the deposition testimony of Officer Fink. (*See* Pls.' 56.1 Stmt., ¶ 38.) That testimony proceeded as follows:
   Q. When Mr. Goddard came off the wall, did you attempt to grab him?
   A. No.
   Q. Did you see any officer attempt to grab him?
   A. No.
   (Okoli Decl., Ex. D at 32.) On the other hand, defendants cite the deposition of Officer Senior, who testified that she attempted to grab Goddard but her hand slipped off his shirt, and Officer Bernal, who testified that he observed Goddard run through the door while being grasped by Officer Senior. (*See* Affirmation of Jennifer Rossan ("Rossan Decl."), Ex. J at 58; Ex. L. at 16-21.)

5  The bulk of cases dealing with the right of a person in custody for protection from suicide analyze the issue as an Eighth Amendment claim dealing with the inadequate provision of medical care. *See, e.g., Woodward v. Correctional Medical Servs. of Ill., Inc.,* 368 F .3d 917, 926 (7th Cir.2004); *Olson v. Bloomberg,* 339 F.3d 730, 735 (8th Cir.2003). Although Eighth Amendment protections only apply to individuals who have been convicted, the Second Circuit has explicitly noted that pretrial detainees are protected by the Due Process Clause, and their rights to medical treatment are "at least as great as those of a convicted prisoner." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citations omitted). "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.* (citation omitted); *see also Cuoco v. Motisgugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that standards from Eighth Amendment context apply to claims brought by pretrial detainees under the Fourteenth Amendment). Based on this logic, other Circuits have applied the same standards applicable to prisoner suicide cases arising under the Eighth Amendment to claims brought by individuals in custody prior to conviction under the Fourteenth Amendment. *See, e.g., Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty, Fla.,* 402 F.3d 1092, 1115 (11th Cir.2005); *Barrie v. Grand Cty, Ut.,* 119 F.3d 862, 868 (10th Cir.1997); *Partridge v. Two Unknown Police Oficers of the City of Houston,* 791 F.2d 1182, 1187 n. 20 (5th Cir.1986).

6  This argument assumes, *arguendo,* that the defendants owed a duty to protect to the plaintiff from himself at the time of the accident, even though he was no longer in their physical custody because of his escape. The general rule is that the Fourteenth Amendment solely imposes a limitation on the State's power to act, and does not create an affirmative obligation on the State to protect the public from harm. *DeShaney v. Winnebago Dep't of Soc. Servs.,* 489 U.S. 189, 196 (1989) ("[T]he Due Process Clauses [of the Fifth and Fourteenth Amendments] generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.") Since state actors did not directly kill the decedent-he committed suicide-in order for plaintiffs to proceed, they must demonstrate that they are not subject to the general rule that "a State's

failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *accord Pena v. DePrisco,* 432 F.3d 98, 107-08 (2d Cir.2005). However, defendants concede that they did owe a duty when they had decedent in custody, based upon the "special relationship" theory of liability which escapes the general rule asserted by *DeShaney,* under which a State has a constitutional obligation to protect an individual from private actors. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 533 (2d Cir.1993). Under the "special relationship" theory, the Supreme Court and Second Circuit have both "recognized that a constitutionally significant special relationship generally involves some type of custody or other restraint on the individuals' ability to fend for themselves." *Matican v. City of New York,* 424 F.Supp.2d 497, 504 (E.D.N.Y.2006) (citing *DeShaney,* 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."); *Ying Jing Gan,* 996 F.2d at 533 ("Special relationships that have been recognized to give rise to a governmental duty to protect against third-person attacks have included custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and a foster child.") Although the defendants concede that their affirmative action of taking Goddard into custody formed a special relationship which engendered a duty to protect, they argue that the "special relationship" and accompanying duty terminated at the moment that decedent voluntarily removed himself from custody by escaping. The defendants have not been able to provide any authority directly supporting the proposition that an individual's escape from custody terminates the duty to protect under the Fourteenth Amendment. However, the Court does not reach the issue of whether the duty is terminated because, even assuming *arguendo* that the defendant officers had a duty to protect the decedent, the facts of this case do not permit a jury determination of deliberate indifference, as discussed *infra.*

**7**  Although plaintiffs argue there is evidence that Officer Sykora knew the stairwell door was broken from previous experience in the building, plaintiffs have not pointed to any evidence in the record which would suggest that Sykora or the other police officers were aware that, if Goddard was able to escape to the stairwell doorway while handcuffed, he would be able to obtain ready access to the roof.

**8**  To the extent that plaintiffs' claim of deliberate indifference attaches to the decision of Officer Fink to push Officer Sykora out of the way when decedent lunged at him, the Court notes that in that context of emergency situations in which officers must make quick decisions, a higher level of culpability is required to make a showing of deliberate indifference. *County of Sacramento v. Lewis,* 523 U.S. 833, 851 (1998) ( "[A]ttention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in one case is less egregious in the other.... As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical ...") (internal citations and footnote omitted). There is absolutely no evidence that Officer Fink sought to facilitate Goddard's escape by pushing Sykora out of Goddard's way as he charged forward; rather, the only evidence in the record, and the only reasonable inference from the facts, is that it was a sudden reaction to ensure officer safety. Consequently, the Court finds that the decision made by Officer Fink in the heat of the moment out of his concern for officer safety cannot rise to the level of culpability required for a finding of deliberate indifference, as a matter of law.

**9**  Defendants argue that, in deciding the motion for summary judgment, the Court should not consider the testimony of the police liability expert. Specifically, defendants assert that "the expert testimony is speculative, conjectural, illogical, and not grounded in any authoritative source or expertise." (Defendants' Reply Brief, at 18.) The Court finds that, even if the expert's testimony is admissible, the conclusory assertions contained therein are insufficient to create any issues of fact on the question of deliberate indifference.

**10**  In its earlier discussion of the duty owed to Goddard by defendants the Court assumed, without deciding, that Goddard remained in custody even after he had escaped. *See, supra,* note 6. The Court made that assumption for the sole purpose of considering plaintiffs' claim that defendants were deliberately indifferent toward Goddard's medical need.

**11**  It is important to note that the Court's analysis of the officers' conduct under the "objectively reasonable" standard for purposes of addressing qualified immunity is not the same analysis that would be conducted under the state negligence standard. As noted earlier, the question of objective reasonableness for qualified immunity purposes is conducted against the backdrop of the "deliberate indifference" standard under the circumstances of this case. In other words, the question is whether an objectively reasonable officer could believe that he was not being deliberately indifferent to Goddard's needs. *See McKenna,* 386 F.3d at 437. That analysis is obviously different than simply examining whether an officer's conduct was negligent under state law. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (" 'Deliberate indifference'describes a mental state more blameworthy than negligence.").

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.